**OSBORN MALEDON**
A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW

The Phoenix Plaza
21st Floor
2929 North Central Avenue
Phoenix, Arizona 85012-2793

P.O. Box 36379
Phoenix, Arizona 85067-6379

Telephone        602.640.9000
Facsimile        602.640.9050

David B. Rosenbaum, 009819
Dawn L. Dauphine, 010833
OSBORN MALEDON, P.A.
2929 North Central Avenue, 21st Floor
Phoenix, AZ 85012-2793
(602) 640-9000
drosenbaum@omlaw.com
ddauphine@omlaw.com

Attorneys for Defendants
(Additional counsel for Defendants appear on signature page)

1
2
3
4
5
6
7

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| | |
|---|---|
| Thomas G. Frazier, a married man, | No. 2:10-cv-01618-SRB |
| Plaintiff, | |
| vs. | **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| Honeywell International, Inc., a Delaware corporation; Honeywell Retirement Earnings Plan; Salaried Employees Pension Plan of Allied Corporation; Salaried Employees Pension Plan of AlliedSignal, Inc.; Salaried Employees Pension Plan of the Bendix Corporation; Pension Plan for Salaried Employees of General Aviation Avionics; Plan Administrator of the Honeywell Retirement Earnings Plan; Plan Administrator of the Salaried Employees Pension Plan of the Allied Corporation; Plan Administrator of the Pension Plan for Salaried Employees of the Bendix Corporation; Plan Administrator of the Pension Plan for Salaried Employees of General Aviation Avionics, | **[ORAL ARGUMENT REQUESTED]** |
| Defendants. | |

Defendants hereby move for summary judgment on Plaintiff's Second Amended Class Action Complaint.  The undisputed facts confirm that Plaintiff cannot establish the elements of the claims asserted on behalf of himself or the classes he represents.  This motion is supported by the accompanying Defendants' Statement of Material Facts ("DSOF"), the Declarations of Brian Marcotte, Lisa Dooley and Russell Hirschhorn, the Compendium of Exhibits, and the following Memorandum of Points and Authorities.

## I.    PRELIMINARY STATEMENT

Plaintiff Thomas Frazier ("Frazier" or "Plaintiff"), a former employee of Honeywell International Inc. ("Honeywell"),[1] brought this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001, *et seq.*, ("ERISA").  He seeks additional benefits under the Salaried Employees Pension Plan of AlliedSignal Inc. (the "Bendix Plan") based on service after he transferred from a location that participated in the Bendix Plan to a different business unit of AlliedSignal that provided him with pension benefits under a different plan.  Because the Bendix Plan never permitted the accrual of additional benefits based on service after an employee transfers to a location that does not participate in the Bendix Plan, and because the Bendix Plan has always been reasonably construed accordingly by the Plan Administrator, Frazier's claims should be dismissed.

In this motion, Defendants demonstrate that:  (a) Frazier is not entitled to the declaratory relief he is seeking with respect to his interpretation of the Bendix Plan; (b) Frazier has no viable claim for failure to distribute an SPD; and (c) Frazier has no individual claim for relief based on purported communications that were contrary to the terms of the Bendix Plan.

Frazier's complaint contains a variety of claims that are based both on the terms of the Bendix Plan and on allegedly misleading communications about the terms of the

---

[1]     Throughout this brief, "Honeywell" refers to Honeywell International Inc. and all of its predecessor companies, including AlliedSignal Inc., Allied Corporation, Bendix Corporation and Honeywell Inc.  For periods prior to December 1, 1999, "AlliedSignal" is used to refer to AlliedSignal Inc. and all of its predecessor companies, including Allied Corporation and Bendix.

1   Bendix Plan.  He also has a free standing claim based on an alleged failure to timely

2   distribute a summary plan description ("SPD") describing the terms of the Bendix Plan.[2]

3   The claims based on the terms of the Bendix Plan have been certified for class treatment,

4   insofar as these claims seek declaratory relief with respect to the proper construction of

5   the Bendix Plan's transfer rules.[3]  The claim for failure to distribute an SPD has likewise

6   been certified for class treatment.  The claim based on allegedly misleading

7   communications was not certified, however, and thus this claim is unique to Frazier.

8   (Doc. 165, at 13.)

9          Frazier's class claim for declaratory relief encompasses multiple provisions of

10   multiple versions of the Bendix Plan, including the 1987 Plan, the 1993 Plan, and the

11   1995 Plan.  Even though Frazier's claim should be governed by the 1995 Plan, as this is

12   the version of the Bendix Plan that was in effect when Frazier transferred out of a

13   Bendix Plan location (Prescott, Arizona) in 1996, Frazier claims entitlement to relief

14   under prior versions of the Bendix Plan as well.  In support of the claims based on

15   earlier versions of the Bendix Plan, Frazier invokes statutory provisions of ERISA that

16   (i) prohibit plan amendments that reduce previously accrued benefits, and (ii) require

17   advance notice of amendments that reduce future benefit accruals.  Under Frazier's

18   theory, if an earlier version of the Bendix Plan guaranteed a participant the right to

19   continue accruing benefits under the Bendix Plan following his/her transfer out of a

20   Bendix Plan location, these statutory rules prevented AlliedSignal from eliminating that

21   right, at least not without advance notice of the change.  For purposes of Defendants'

22   motion, however, these statutory provisions need not be considered because, for the

23   reasons stated, *no version* of the Bendix Plan *ever* provided for the continued accrual of

---

[2]    Frazier also asserts an individual claim for failing to maintain proper procedures
in connection with the administration of his benefit claim, which is not the subject of this
motion.  Defendants reserve their right to assert their defenses to this claim at a later
date.  For reasons previously stated, Frazier is not entitled to any relief for this claim.
(Doc. 40, at 15-16; Doc. 51, at 15.)
[3]    The Court's ruling did not certify for class treatment individual determinations of
benefit entitlement, which are subject to individualized defenses, including a statute of
limitations defense.  In its Scheduling Order, the Court deferred adjudication of these
issues until after the claims for declaratory relief were resolved.  (Doc. 175, at ¶ 2(B).)

1    Bendix Plan benefits based on service after a transfer of employment to a non-Bendix

2    Plan location.

3           The Bendix Plan provisions applicable to transferring employees were consistent

4    with AlliedSignal's then company-wide benefits policy (*i.e.*, its policy prior to 2000,

5    when AlliedSignal acquired Honeywell Inc. and changed its name to Honeywell

6    International Inc.).  The policy, pursuant to which employees moved from one pension

7    plan to another when they moved from one business unit to another, was designed to

8    insure that employees working side by side at any particular location would have the

9    same benefits package.  This remained the policy until 2000, when, following

10   AlliedSignal's merger with Honeywell Inc., the combined Honeywell company decided

11   that employees would permanently remain in their then current pension plan, even if

12   they transferred to a new location.  To that end, Honeywell gave its existing employees a

13   choice between (i) having their pension benefits calculated under the formula of the plan

14   in which they were then currently participating for the duration of their careers, and

15   (ii) switching to a new plan formula.  Prior to the changes in 2000, the Bendix Plan was

16   written and interpreted consistent with AlliedSignal's policy.  The undisputed facts

17   establish that participation in the Bendix Plan was limited initially to legacy Bendix

18   sites, *i.e.*, sites in which Bendix operated before Allied Corporation acquired it, and then

19   extended to a number of additional sites, including the Prescott, Arizona site, which

20   AlliedSignal acquired in 1993 and where Frazier worked until April 1996.  Contrary to

21   Frazier's assertions, the business in Olathe, Kansas to which he transferred in 1996

22   never participated in the Bendix Plan.  The fact that the Olathe site, like the Prescott site,

23   was an avionics-based business is not relevant because the Olathe site was not a legacy

24   Bendix location.  Instead, the Olathe site sponsored a different pension plan for its

25   employees.

26          None of the Bendix Plan terms, under any version of the Plan, afforded

27   employees transferring out of Bendix Plan sites the opportunity to continue to actively

28   participate in the Bendix Plan.  At most, the Bendix Plan allowed employees who

transferred *to* a Bendix Plan location the right to receive a Bendix Plan benefit based on all of their years of service, including service prior to their arrival at the Bendix Plan location, with an offset for benefits accrued under the plan in which they participated prior to their transfer.  However, Frazier never had an opportunity to avail himself of this provision because he never returned to a Bendix Plan location after transferring from Prescott to Olathe in 1996.

Like other AlliedSignal plans, the Bendix Plan contained generous provisions designed to insure that transferring employees were not unnecessarily penalized in the calculation of their Bendix Plan benefits as a result of the transfer to a non-Bendix Plan location.  These rules provided transferees with credit for post-transfer service for vesting and early retirement purposes only.  They also insured that transferring participants would get the benefit of their final pay in the calculation of their Bendix Plan benefits, even if that pay was earned after their date of transfer.  But none of these rules extended "service credit" past the date of transfer, and thus years of service worked after their transfer did not factor into the calculation of their benefits under the Bendix Plan, as Frazier contends.

Although certain limited exceptions — typically unauthorized promises made by AlliedSignal personnel without the requisite authority under the Bendix Plan — were made outside the confines of the Bendix Plan document for a select group of employees who transferred from certain Bendix Plan locations, these exceptions are of no utility to Frazier — let alone the large class he now represents — because they neither applied to him nor the location where he worked in Prescott, Arizona.  Moreover, notwithstanding these generally *ultra vires* exceptions, the Plan Administrator's interpretation and application of the Bendix Plan's transfer rules never deviated.  Accordingly, there is no basis for Frazier's claim for benefits based upon the argument that the Bendix Plan somehow afforded him the right to continue to accrue benefits under the Bendix Plan after his transfer to Olathe.

The undisputed facts also establish that the Plan Administrator had distribution procedures in place for SPDs, thus undermining any class claim for a failure to distribute SPDs.  The evidence also confirms that no Bendix Plan fiduciary ever assured Frazier that he would continue to receive credited service under the Bendix Plan after transferring to Olathe.  To the contrary, the undisputed facts establish that Frazier was repeatedly advised that, following his transfer, he was no longer accruing benefits under the Bendix Plan, and was instead accruing benefits under the plan sponsored by his new Olathe location.  Thus, Frazier has no viable individual fiduciary breach claim for alleged misrepresentations.[4]

Accordingly, the Court should grant Defendants' motion for summary judgment and dismiss the Second Amended Class Action Complaint.

## II.   FACTS

### A.  General Background

Honeywell is a multi-national corporation with over 130,000 employees organized into four major business groups.  These business groups, in turn, are comprised of a multitude of different business units and divisions scattered over more than 1,300 sites in over 90 countries around the world.  (DSOF ¶ 1.)  Honeywell is the product of scores of mergers and acquisitions, the largest of which were Allied Corporation's ("Allied's") acquisition of the Bendix Corporation ("Bendix") in 1983, Allied's acquisition of The Signal Companies Inc. ("Signal") in 1985 (at which time Allied changed its name to AlliedSignal Inc.), and AlliedSignal's acquisition of Honeywell Inc. in 1999 (at which time AlliedSignal changed its name to Honeywell International Inc.).  (DSOF ¶ 2.)

Prior to 2000, AlliedSignal maintained numerous defined benefit pension plans for its U.S. employees, each covering different segments of its workforce and each with

---

[4]      Defendants have numerous other defenses to Frazier's claims that are not referenced in this motion, including a statute of limitations defense and the defense that Frazier never participated in the 1987 Bendix Plan.  Defendants reserve their right to present these defenses in response to Frazier's motion for summary judgment and/or in the event their motion for summary judgment is not granted.

its own particularized benefit formula.  (DSOF ¶ 7.)  Most of these retirement plans were traditional "final average pay" plans, although a few were "career average" plans.  In a final average pay plan, a participant's benefit is calculated based on years of service and compensation earned at the end of the participant's career (which, for most employees, is higher than their early career compensation).  *See Esden v. Bank of Boston*, 229 F.3d 154, 158 n.4 (2d Cir. 2000) (citing John H. Langbein & Bruce A. Wolk Pension and Employee Benefit Law 45 (3d ed. 2000)).  In a career average plan, a participant's retirement benefit is typically calculated by aggregating annual accruals over the employee's entire career.  Cash balance plans are a form of career average plan in that the participant's retirement benefit is the accumulated value of annual pay and interest credits, as reflected in a hypothetical account (similar to a defined contribution plan).  *See id.* at 158, 160.

Prior to 2000, AlliedSignal employees who transferred from one business location to another were similarly transferred from their prior site's pension plan to the pension plan maintained for employees of the new site.  (DSOF ¶ 8.)  This enabled AlliedSignal to avoid having employees working side by side with different benefit packages.  (Declaration of Russell L. Hirschhorn ("Hirschhorn Decl.") ¶ 6, at 80:18-23.)  While transferring employees continued to receive credit under the prior plan for purposes of vesting and eligibility (including eligibility for, and the amount of, early retirement benefits), they ceased to receive "service credits"[5] under the prior plan once they transferred to the new location and began accruing benefits under the new location's plan.  (DSOF ¶ 8.)

In 1999 and 2000, the transfer rules changed.  First, in connection with AlliedSignal's acquisition of Honeywell Inc., the plans were amended to provide that all legacy AlliedSignal employees would remain in AlliedSignal plans and all legacy

---

[5]     "Service credits" are the credits used to actually calculate a participant's retirement benefit under a final average pay plan's benefit formula.  For example, if a plan's benefit formula is 1% of final average pay times years of service, the "years of service" part of the formula constitutes the "service credits."

Honeywell Inc. employees would remain in Honeywell Inc. plans, even if these employees subsequently transferred between legacy AlliedSignal and legacy Honeywell Inc. locations.  (DSOF ¶ 9.)  Then, in 2000, employees were given a one-time irrevocable choice between having their future benefits calculated:  (i) under the plan formula under which they were then covered, or (ii) under a new pension equity plan formula.  Thereafter, employees remained covered by the plan formula elected regardless of whether they subsequently transferred to a different business unit or site.  (DSOF ¶ 10.)

### B. **The Bendix Plan**

#### 1. *Participation in the Bendix Plan*

Bendix was acquired by Allied in 1983, and merged into Allied on April 1, 1985.  (DSOF ¶¶ 2, 11.)  Like many of the companies Allied acquired, Bendix had its own pension plan.  (DSOF ¶ 12.)  Established in 1965, the final average pay plan covered all eligible employees of "The Bendix Corporation."  (*Id.*)  After the mergers of Bendix with Allied and then Allied with Signal, the Bendix Plan documents were amended to, *inter alia*, clarify that coverage under the Bendix Plan was limited to:  (i) employees who worked at certain former Bendix divisions that subsequently became integrated into Allied businesses, and (ii) certain legacy Bendix subsidiary corporations.  (DSOF ¶¶ 13-20.)  To that end, the 1987 Bendix Plan provided that coverage was limited to eligible employees of the "Company," and appended a "Schedule A" that specifically identified the "Former Bendix Divisions" and legacy Bendix subsidiary corporations satisfying that definition.  (DSOF ¶ 17.)  The explicit limitation in Schedule A to "Former Bendix Divisions" confirms that coverage extended only to those locations belonging to the former divisions of Bendix as of January 1, 1987, the effective date of the 1987 Bendix Plan, and thus did not, and by definition could not, include subsequently acquired businesses, even if these businesses were in the same or similar line of business as one or more of the covered legacy Bendix entities.  (DSOF ¶¶ 17-18.)  While other businesses could be added as participating companies, that action required the explicit

approval of the AlliedSignal Board of Directors.  (DSOF ¶ 17.)

The 1993 and 1995 Bendix Plans limited coverage to "Eligible Employees" at a "participating location" of a "Participating Employer."  (DSOF ¶ 23.)  The participating locations were limited to a combination of legacy Bendix business sites, and other sites that AlliedSignal acquired and expressly approved as participating locations.  (DSOF ¶ 32.)

### 2.  *The Bendix Plan Transfer Rules*

Consistent with AlliedSignal's policy prior to 2000, the Bendix Plan provided that employees ceased to accrue benefits under the Bendix Plan when they transferred to another location that did not participate in the Bendix Plan.  (DSOF ¶ 19.)  The 1987 Bendix Plan stated, for example, that a participant's benefit was based on his "Service," average salary, and "the terms of the Plan in effect on the date of transfer."  (DSOF ¶ 19.)  The 1987 Bendix Plan further provided that "Service" was limited to those years that an employee worked for the "Company," which, as noted above, was specifically defined to mean a Former Bendix Division or a legacy Bendix subsidiary corporation that participated in the Bendix Plan.  (DSOF ¶¶ 16-17.)  Similarly, the 1993 and 1995 Bendix Plan restatements provided that, for purposes of calculating the amount of a participant's benefit, only service as of the time of the transfer would be included in the pension calculation.  (DSOF ¶¶ 26-31.)  Service after the transfer counted under the Bendix Plan only for purposes of vesting in Bendix Plan benefits, and for purposes of qualifying for, and determining the amount of, early retirement benefits ("eligibility service"); but it did not impact the years of service that factored into the calculation of the amount of a participant's normal retirement benefit ("credited service"). (Declaration of Lisa Dooley ("Dooley Decl.") Ex. 10 at § 13.2(c); Ex. 16 at § 5.5(c); Ex. 24 at 5.5(b)(1).)

To ensure that employees transferring out of a Bendix Plan location were not penalized under the Bendix Plan by these rules, the Bendix Plan documents provided (or were construed to provide) that, even though credited service was frozen as of the date

of transfer, the calculation of the participant's benefit would take into account any higher pay earned after the date of transfer.  (Dooley Decl. Exs. 30; 32; 33.)  The 1987 Bendix Plan provided, for example, that a participant who transferred to and became covered under the pension plan of an affiliate that was 80% or more owned by AlliedSignal would receive a benefit under the Bendix Plan based on all of the participant's years of service at both the Bendix Plan location and at the affiliated company (using an earnings roll-up to the date of termination), multiplied by the ratio of (i) the participant's service at the Bendix Plan site prior to his transfer, to (ii) the participant's total service both before and after his transfer.  (Dooley Decl. Ex. 10 at § 10.7.)[6]  The 1993 and 1995 Bendix Plan restatements had (or were construed to have) a similar "proration" rule for employees who transferred to another final average pay plan.  (DSOF ¶ 35; Dooley Decl. Ex. 30 at D0063505.)  For employees transferring to a cash balance plan, the 1995 Bendix Plan directed that benefits be calculated pursuant to the "uniform procedures" of the Plan Administrator, which provided that Bendix Plan benefits were frozen as of the date of transfer, but that salary increases post-dating the transfer would nevertheless be factored into the benefit calculation.  (DSOF ¶¶ 36, 39; Dooley Decl. Ex. 30 at D0063505.)

The "uniform procedures" referenced in the 1995 Plan are set forth in a chart that was created in the mid-1990s in connection with the centralization of AlliedSignal's benefit administration system.  (DSOF ¶ 37.)  The chart was designed to summarize various plan rules, including the transfer rules, as they had existed for years. (Hirschhorn Decl. ¶ 7, at 52:24-53:8; ¶ 3, at 137:2-8.)  It did not modify any pre-existing rules.  (Hirschhorn Decl. ¶ 7, at 52:24-53:8.)  The chart confirms AlliedSignal's longstanding practice of moving employees from plan to plan as they moved from one business unit to another.  (*Id.* ¶ 7 at 53:17-23; ¶ 3, at 177:12-178:1; ¶ 6, at 80:18-23.)

---

[6]     For example, if a participant transferred from a Bendix Plan location to a wholly owned affiliate of AlliedSignal after 20 years of service, became covered by the affiliate's pension plan and retired after 30 years of total employment with Honeywell, he would receive a benefit under the Bendix Plan based on two-thirds of the benefit he would have received had he stayed at a Bendix Plan site for his entire career.

For participants transferring from a final average pay plan to a final average pay plan, the uniform procedures contemplate the proration of benefits in the manner described above.  (DSOF ¶ 38.)  For participants transferring from a final average pay plan to a cash balance plan, the uniform procedures provide that employees receive a benefit from the final average pay plan based on their service through their date of transfer (with an adjustment for final average pay, as described above), plus whatever benefit they accrue under the cash balance plan.  (DSOF ¶ 39.)  Service post-dating a transfer is only taken into account under the Bendix Plan for eligibility and vesting purposes, including the calculation of any early retirement benefits.  (DSOF ¶ 39; Dooley Decl. Ex. 30 at D0063505.)

These transfer rules were also confirmed in two memoranda issued by the Plan Administrator's office in 1993 and 1994.  (DSOF ¶ 39; Dooley Decl. Exs. 32-33.) Consistent with the uniform procedures, the memoranda state that credited service under the Bendix Plan was frozen on the date of transfer, but that benefits would be based on earnings through the date of termination.  (*Id.*)

3.  *"Grandfathering" of Certain Employees*

Notwithstanding the Bendix Plan design, there were a limited number of occasions when — usually without proper authorization — exceptions were made to the transfer rules.  In these few instances, employees who transferred from the Bendix Plan to a different plan were promised a retirement benefit equivalent to the benefit they would have received had they not transferred.  (Dooley Decl. Ex. 41; Hirschhorn Decl. ¶ 3, at 162:15-165:13.)  For example, in the mid to late 1980s, a limited group of employees who transferred from a Bendix facility in Ft. Lauderdale, Florida to King Radio[7] in Olathe, Kansas were advised (by an employee without authority to do so) that they would be "grandfathered," meaning that they would remain in the Bendix Plan notwithstanding their transfer.  (Dooley Decl. Ex. 41.)  Once the Plan Administrator learned of this practice, subsequent requests for "grandfathering" were denied, but

_____
[7]     King Radio was also known as "Bendix/King."  (DSOF ¶ 5.)

1    Honeywell concluded that it would be unfair to reneg on the prior promises made, even

2    if they were unauthorized.  (Hirschhorn Decl. ¶ 3, at 162:15-164:16.)  Because the

3    promises made to the grandfathered group could not be fulfilled under the Bendix Plan's

4    terms,[8] Honeywell is now paying the additional benefits through a special supplemental

5    plan, rather than through the Bendix Plan.[9]  (*Id.* at 162:15-165:10.)

6            **4.   *The Plan Administrator's Distribution of SPDs Describing the Bendix***
                      ***Plan Terms***
7

8            Descriptions of the Bendix Plan's terms are set forth in SPDs dated October 1986,

9    December 1996 and June 2000.  (DSOF ¶ 61.)  The SPDs were distributed in accordance

10   with a process that was designed to ensure that they reached all Bendix Plan participants.

11   (DSOF ¶ 62.)  Pursuant to this process, corporate headquarters would obtain the "head

12   count" of participants at each specific business unit and either direct the printer to drop-

13   ship the SPDs directly to the facilities for distribution or, upon request by a facility,

14   drop-ship the SPDs to the business unit's headquarters for subsequent distribution to

15   individual sites.  (DSOF ¶ 63.)

16           **5.   *The Plan Administrator's Interpretation of the Bendix Plan Terms***

17           Pursuant to the terms of the Bendix Plan, the Plan Administrator has full

18   discretionary authority to interpret the provisions of the Bendix Plan and to decide any

19   matters arising in connection with the interpretation and/or administration of the Plan.

20   (DSOF ¶ 78.)  For purposes of this lawsuit, the Plan Administrator has submitted a

21   Declaration summarizing his interpretation of the relevant Bendix Plan terms, and

22   responding to various contentions regarding the interpretation of the Bendix Plan made

23   by Frazier in his administrative claim and/or his Second Amended Class Action

24   Complaint.  (DSOF ¶¶ 82-84.)  The Declaration confirms, *inter alia*, that:

25   _____

     [8]      A pension plan governed by ERISA may only provide benefits prescribed by the
26   terms of the plan document.  To do otherwise would, among other things, jeopardize the
     tax qualified status of plan.  *See* 26 U.S.C. § 401(a)(1); Rev. Rul. 70-315, 1970-1 C.B.
     91 ("any failure to make distributions in accordance with the terms of the plan will be
27   considered in determining whether the plan continues in a qualified status").
     [9]      Although some of the grandfathered individuals were erroneously paid a full
28   service Bendix Plan benefit from the Plan, those payments have been or are in the
     process of being corrected.  (Hirschhorn Decl. ¶ 3, at 162:15-166:3.)

- Prior to 2000, employees moved from one pension plan to another when they transferred to different divisions, businesses and/or locations;

- The Olathe, Kansas facility to which Frazier transferred in 1996 (*see* below) was never a participating company, location or employer under the Bendix Plan;

- Deer Valley, another location to which Frazier later transferred (*see* below) was a legacy Honeywell Inc. (not legacy AlliedSignal) facility that never participated in the Bendix Plan;

- Under the 1987 Bendix Plan, for purposes of calculating benefits, service was frozen as of the date a participant transferred to a location that did not participate in the Bendix Plan; and

- Frazier's transfer to Olathe in 1996 caused him to cease accruing benefits under the Bendix Plan and to begin accruing benefits under the King Radio Plan's cash balance formula.[10]

(DSOF ¶¶ 85-90.)

### C. Frazier's Employment History

Frazier worked for a Sundstrand Data Control ("Sundstrand") business called Global Wulfsberg first in Irvine, California and then in Prescott, Arizona from 1988 through November 1993, at which time AlliedSignal acquired Sundstrand. (DSOF ¶ 40.) He continued working at the Global Wulfsberg facility until 1996, when AlliedSignal closed the site. (DSOF ¶¶ 41-42.) Former Sundstrand employees, including Frazier, became eligible to participate in the Bendix Plan when Prescott was approved as a participating location, which could not have occurred until after the 1993 Bendix Plan restatement.[11] (DSOF ¶ 65.)

---

[10]   The King Radio Plan was formally known as the Pension Plan for Salaried Employees of General Aviation Avionics and also was referred to as the Bendix/King Avionics Retirement Growth Plan and the Avionics Salaried Pension Plan. (DSOF ¶ 51; Dooley Decl. Ex. 11; Hirschhorn Decl. Ex. 36.)

[11]   Although Defendants dispute Frazier's contention that former Sundstrand employees were eligible to participate in the 1987 Bendix Plan — because they were never employed by a Former Bendix Division or a legacy Bendix subsidiary identified on Schedule A of the 1987 Bendix Plan (*see supra* at Part II.B), this contention is immaterial to Defendants' motion because Defendants have demonstrated that the Bendix Plans' transfer rules — as they apply to Frazier — did not change between the 1987 and 1995 Bendix Plans.

1   In 1996, when the Prescott facility was closing, Frazier and some of his co-

2   workers transferred to another AlliedSignal business called King Radio in Olathe,

3   Kansas.  (DSOF ¶¶ 42, 44.)  King Radio sponsored a cash balance plan (the "King Radio

4   Plan").  (DSOF ¶ 45.)  Consistent with AlliedSignal's longstanding policy and the

5   Bendix Plan rules discussed above, Frazier ceased active participation in the Bendix

6   Plan as of the date of his transfer and immediately commenced participation in the King

7   Radio Plan.  (DSOF ¶ 46.)

8   In March 2000, Frazier transferred to a legacy Honeywell Inc. facility in Deer

9   Valley, Arizona (the Deer Valley facility was acquired by AlliedSignal in connection

10  with its acquisition of Honeywell Inc. in 1999).  (DSOF ¶ 48.)  Consistent with a

11  December 1999 King Radio Plan amendment, Frazier continued to participate in the

12  King Radio Plan after his transfer to Deer Valley.  (DSOF ¶¶ 9 at Ex. 13, 48.)  The King

13  Radio Plan amendment implemented the Company's policy decision, described above,

14  not to have legacy AlliedSignal employees transfer to legacy Honeywell Inc. pension

15  plans, and vice versa, when they transferred locations.  (*See supra* at Part II.A.)

16  Frazier retired in 2008.  (DSOF ¶ 54.)  After retiring, he contended that he was

17  led to believe he would continue to receive Bendix Plan benefits even after his transfer

18  from Prescott to Olathe.  (Doc 87, ¶ 16; Hirschhorn Decl. ¶ 4, at 152:18-153:14.)  There

19  were numerous formal and authoritative communications, however, that placed, or

20  should have placed, Frazier on notice that:  (i) his active participation in the Bendix Plan

21  had ceased when he left Prescott, and (ii) he had subsequently become a participant in

22  the King Radio Plan.  First, prior to his transfer to Olathe, Frazier received a letter

23  advising him that he would cease participation in the Bendix Plan and begin

24  participating in the Bendix/King (*i.e.*, King Radio) benefit programs, including the King

25  Radio cash balance plan.  (DSOF ¶ 45.)  Second, at a meeting announcing the Prescott

26  facility closure that was attended by virtually all Prescott personnel, employees received

27  an Associate Resource Guide that included a side-by-side comparison of the pension

28  benefits available at the different AlliedSignal locations.  (DSOF ¶ 43.)  Third, while

working in Olathe, Frazier received quarterly benefit statements showing the benefits he had accrued in the King Radio Plan.  (DSOF ¶ 47.)  Finally, before making his choice to continue participating in the King Radio Plan in 2000, Frazier received multiple documents showing that he was participating in the King Radio Plan, and was told by a benefit call center representative that he was not eligible to choose between the new pension equity plan and the Bendix Plan.  (DSOF ¶¶ 50, 52.)

In his deposition, Frazier testified that he never reviewed a plan document or SPD prior to his retirement and that his understanding of his pension rights was based solely on conversations with his supervisor, Thomas Littlejohn, in 1993, 1996 and 2008 (after he retired).  (DSOF ¶¶ 56-57.)  Mr. Littlejohn, who had no responsibilities with respect to the Bendix or King Radio Plans (DSOF ¶ 58), testified that:  (1) he had only one conversation with Frazier about his pension benefits, which occurred in the 1993 timeframe and was in connection with AlliedSignal's acquisition of Sundstrand; (2) he never told Frazier that he would continue in the Bendix Plan forever; and (3) he never told Frazier that he would continue participating in the Bendix Plan after transferring to Olathe, or that he would receive retirement benefits similar to Bendix Plan benefits after transferring to Olathe.  (DSOF ¶ 59.)  Mr. Littlejohn also testified that Frazier (i) never asked about pension benefits when he was considering whether to move to Olathe, and (ii) was only concerned about his salary during those deliberations.  (DSOF ¶ 60.)[12]

### D. **Frazier's Administrative Claim**

After retiring, Frazier filed an administrative claim with the Honeywell Retirement Earnings Plan ("HREP") contending that he was not notified of, and did not agree to, his transfer from the Bendix Plan to the King Radio Plan when he transferred locations in 1996.  (DSOF ¶ 74.)  In support of his claim, he did not argue that he was entitled to the additional benefits under the terms of the Bendix Plan.  (*Id.*)  Rather, he

---

[12]     For the reasons discussed below (*see infra* at Part III.C), the accuracy of  Mr. Littlejohn's recollection is not material to this motion because Frazier could not have reasonably relied on any assurances received from Littlejohn, even if they had been provided.

cited Sundstrand's purchase agreement with AlliedSignal, and a May 20, 1991 memorandum to "Bendix Transferees" that purported to grandfather certain employees in the Bendix Plan (those arriving in the mid to late 1980s from Fort Lauderdale), notwithstanding their transfer to King Radio.  (*Id.*)  The Plan Administrator denied Frazier's claim (DSOF ¶ 75), and Frazier then filed an administrative appeal.  (DSOF ¶ 76.)

On May 6, 2011, the Honeywell Pension and Savings Committee (the "Committee") rendered a formal determination on Frazier's appeal.  (DSOF ¶ 77.)  The determination addressed both the appeal and new allegations contained in the Amended Class Action Complaint that Frazier had filed before his appeal was decided.[13]  (*Id.*)  In its determination, the Committee reiterated that Frazier was not entitled to additional benefits under the Bendix Plan formula "because under the relevant Plan terms, his transfer to the Olathe, KS location in 1996 caused him to cease accruing benefits under [the Bendix Plan] formula and to become covered under [the King Radio Plan's] cash balance formula."  (*Id.*)  In so ruling, the Committee cited the Bendix Plan provisions that exclude from credited service periods of employment with businesses that did not participate in the Bendix Plan.  (*Id.*)  The Committee also noted that Frazier had been informed in 1996 that, upon his transfer to King Radio, he would cease coverage under the Bendix Plan.  (*Id.*)

The Committee rejected Frazier's arguments based on the Sundstrand Purchase Agreement and the May 20, 1991 memorandum, explaining that the Purchase Agreement merely entitled former Sundstrand employees to participate in *a pension plan* — not necessarily the Bendix Plan; and the May 20, 1991 memorandum did not apply to Frazier because it was targeted to a specific group of individuals who transferred from another location prior to May 20, 1991.  (*Id.*)  The Committee also addressed and rejected a new argument asserted in the Amended Class Action Complaint, namely that Frazier became

---

[13]    The determination did not address any claims under the 1987 Bendix Plan, because these claims were not asserted until the filing of Frazier's *Second* Amended Class Action Complaint in October 2012.  For the reasons stated in the accompanying Declaration of Brian Marcotte, however, Frazier's claims for benefits fare no better under the 1987 Bendix Plan.

1   entitled to additional Bendix Plan benefits as a result of his transfer of employment to

2   Deer Valley in 2000.  (*Id*.)  The Committee determined that the business to which

3   Frazier transferred in 2000 did not participate in the Bendix Plan and found that there

4   was nothing to indicate that Frazier was informed in 2000 that he would again begin

5   participating in the Bendix Plan.  (*Id*.)  To the contrary, the determination letter noted

6   that Frazier affirmatively elected, in 2000, to continue to accrue benefits under the King

7   Radio Plan for the duration of his Honeywell career.  (*Id.*)

8   **III.   ARGUMENT**

9       **A.  Deference to The Plan Administrator, As Well As a Plain Reading of The**
        **Plan Terms and The Undisputed Evidence of The Plan Administrator's**
10      **Consistent Interpretation of These Terms, Requires That Frazier's**
        **Benefit Claim Be Dismissed**
11

12          The Court should interpret the Bendix Plan consistent with Brian Marcotte's (*i.e.*,

13  the Plan Administrator's) reasonable determination that Frazier is not entitled to

14  additional benefits under the Bendix Plan, as set forth in his letter denying Frazier's

15  administrative appeal, and his accompanying Declaration.  That determination is

16  consistent with the terms of all applicable plans, as well as the underlying policies and

17  uncontroverted intent, as conveyed by Honeywell's benefits personnel.

18          When, as here, an ERISA plan grants the plan administrator discretion to interpret

19  plan language and resolve factual disputes, a court may review the plan administrator's

20  decisions solely for an abuse of that discretion.  *See, e.g.*, *Conkright v. Frommert*, 130 S.

21  Ct. 1640, 1651 (2010) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115

22  (1989)).  In *Frommert*, the Supreme Court reiterated the importance of the deferential

23  standard of review, first set forth in *Firestone*, 489 U.S. at 109.  The Supreme Court

24  explained that:

25          [D]eference [to the administrator's decision] preserves the 'careful
            balancing' on which ERISA is based.  . . . It also promotes predictability,
26          as an employer can rely on the expertise of the plan administrator . . . .
            [and] serves the interest of uniformity, helping to avoid a patchwork of
27          different interpretations of a plan . . . .

28

- 16 -

1    *Frommert*, 130 S. Ct. at 1649.  Notably, the Supreme Court held that deference to the

2    plan administrator's interpretation of the plan was appropriate even when the

3    interpretation was rendered ***outside of the claims process***.  *Id.* at 1645, 1651 (emphasis

4    added); *see also*, on remand, *Frommert v. Conkright*, 825 F. Supp. 2d 433, 439-40, 442

5    (W.D.N.Y. 2011) (observing that plan administrator had set forth his proposed

6    interpretation in an affidavit and applying the Supreme Court's directive that deference

7    be afforded to a plan administrator's interpretation of a plan rendered outside the plan

8    administrative process).

9          Here, as in *Frommert*, the Court should defer to the Plan Administrator's

10   interpretation of the Bendix Plan, even if that interpretation was not fully rendered until

11   after the lawsuit was filed.  The Plan Administrator's conclusion that the Bendix Plan's

12   transfer provisions do not provide for a full service Bendix Plan benefit (with or without

13   an offset) is consistent with all the applicable provisions of the Bendix Plan, and thus

14   does not constitute an abuse of the Plan Administrator's discretion.  *See Anderson v.*

15   *Suburban Teamsters of N. Ill. Pen. Fund Bd. of Trs.*, 588 F.3d 641, 649 (9th Cir. 2009)

16   (holding that plan administrator could not be found to have abused its discretion upon

17   finding that it reasonably construed the relevant plan provisions in accordance with the

18   plain language of the plan); *Watkins v. Westinghouse Hanford Co.*, 12 F.3d 1517, 1524-

19   25 (9th Cir. 1993) (same).

20         The Plan Administrator's conclusions are also consistent with the terms of the

21   Bendix Plan, the decades-long interpretation of the Bendix Plan by the Plan

22   Administrator, and the day-to-day operation of the Bendix Plan.  (*See supra* at Part

23   II.B.1-2.)  Thus, even if the Court were to engage in *de novo* review, the result would

24   not change, as the only reasonable interpretation of the Bendix Plan mandates a finding

25   that it does not provide for an all-service benefit in cases where employees transfer to

26   other pension plans.

27         Accordingly, Frazier's claim for benefits under ERISA § 502(a)(1)(B) (Count

28   One) fails.  Likewise, his statutory claims alleging an illegal cutback of benefit rights

- 17 -

upon transfer (Count Two), and for the failure to provide notice of the elimination of such rights (Count Two), must similarly fail as the Bendix Plan never conferred such rights in the first place.

### B.  Plaintiff's Claim for Failure to Distribute SPDs Fails

Frazier claims that Defendants violated ERISA by allegedly failing to provide SPDs to plan participants.  (Doc. 87, at ¶¶ 124-30; *see also* Doc. 165, at 7.)  As this Court previously ruled, Plaintiff's claim must fail if Defendants can demonstrate that it "generally distributed SPDs to Plan participants—[Defendants] would not have to show that each individual class member received an SPD."  (Doc. 165, at 7.)  *See also Meckel v. Cont'l Res. Co.*, 758 F.2d 811 (2d Cir. 1985) (mere denial of receipt does not rebut presumption of timely mailing, and thus there must be some proof that regular office practice was not followed or was so carelessly executed for the presumption to become unreasonable); *Francis v. Telecare Corp.*, No. C08-2468, 2009 WL 1578714, at *3 (N.D. Cal. June 4, 2009) (unsubstantiated allegations denying receipt not sufficient to overcome summary judgment); *Bronia, Inc. v. Ho*, 873 F. Supp. 854 (S.D.N.Y. 1995) (testimony of an individual as to standard office procedure was sufficient proof of mailing and receipt).  The undisputed evidence shows that the Plan Administrator did, in fact, follow a process to ensure that SPDs were distributed to participants.  (DSOF ¶¶ 61-63.)  Accordingly, Count Five should be dismissed.

### C.  Frazier's Claim for Breach of Fiduciary Duty Is Unsubstantiated

As this Court recognized, the only fiduciary breach claim asserted in Count Three that is independent of Frazier's other claims is one for misrepresentation concerning his entitlement to continued accrual of Bendix Plan benefits. (Doc. 165, at 8.)  Although the Second Amended Class Action Complaint is ambiguous as to the factual basis for this assertion — *e.g.*, whether it is based on allegedly misleading SPDs or other communications — the undisputed evidence demonstrates that Defendants did not make misrepresentations of any kind upon which Frazier could reasonably have relied.

1    As this Court recognized, to prove an ERISA breach of fiduciary duty based on a

2    misrepresentation, courts in the Ninth Circuit require that a plaintiff establish each of the

3    following elements:  "(1) the status as an ERISA fiduciary acting as a fiduciary; (2) a

4    misrepresentation on the part of the defendants; (3) the materiality of that

5    misrepresentation; and (4) detrimental reliance by the plaintiff on the

6    misrepresentation."  (Doc. 165, at 8 (quoting *Carr v. Int'l Game Tech.*, Nos. 3:09-cv-

7    00584-ECR-WGC, 3:09-cv-00585-ECR-WGC, 2012 WL 909437, at *2 (D. Nev. Mar.

8    15, 2012) (italics removed)).)

9    Here, Frazier claims to have been led to believe that he would continue to accrue

10   benefits under the Bendix Plan after his transfer to Olathe in 1996.  Because Frazier

11   testified that he did not receive a copy of an SPD until *after* his employment ended,

12   (DSOF ¶ 56), this claim cannot be based on any alleged misstatements contained in an

13   SPD.  *See In re Computer Scis. Corp. ERISA Litig.*, 635 F. Supp. 2d 1128, 1143 (C.D.

14   Cal. 2009) (rejecting misrepresentation claim where plaintiffs could not prove that they

15   actually read the specific documents at issue and therefore could not establish

16   detrimental reliance upon such statements).  Instead, Frazier's claim is apparently based

17   on his communications with his supervisor, Mr. Littlejohn.  (DSOF ¶ 57.)  Apart from

18   the fact that Mr. Littlejohn, at his deposition, flatly denied making *any* representation to

19   Frazier concerning his entitlement to continue to accrue benefits under the Bendix Plan,

20   Frazier could not reasonably have relied on Mr. Littlejohn's advice because:

21   (i) Littlejohn was not a plan fiduciary and did not purport to speak for the Bendix Plan;

22   and (ii) Frazier received numerous other communications directly from Plan

23   representatives that clearly put him on notice that his active participation in the Bendix

24   Plan had ended upon his transfer to Olathe and the King Radio Plan.  (DSOF ¶¶ 45, 47,

25   49-53, 58-60.)  *See In re Computer Scis. Corp.*, 635 F. Supp. 2d at 1140 (rejecting

26   fiduciary breach claims and holding that "ERISA liability arises from misleading

27   statements only if the statements are made in a fiduciary, not corporate, capacity");

28   *Brant v. Principal Life & Disability Ins. Co.*, 195 F. Supp. 2d 1100, 1116-17 (N.D. Iowa

Apr. 8, 2002) (finding plaintiff's continued reliance on an allegedly erroneous benefit statement to be unreasonable once he was informed that the representation was wrong, and that "[s]uch obstinate reliance on a representation confirmed to be incorrect simply was not reasonable as a matter of law"); *Rolland v. Textron, Inc.*, No. CV-105-023, 2008 WL 858887, at *14-15 (S.D. Ga. Mar. 31, 2008) (holding that plaintiff's continued reliance on erroneous benefit information was not reasonable in light of subsequent documentation and verbal statements contradicting the prior information), *aff'd*, 300 F. App'x 635 (11th Cir. 2008).

Because Frazier cannot satisfy the requisite elements of a fiduciary misrepresentation claim, Count Three must be dismissed.[14]

## IV.   **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court enter summary judgment in their favor and dismiss Plaintiff's Second Amended Class Action Complaint with prejudice.

DATED this 9th day of August, 2013.

> David B. Rosenbaum
> Dawn L. Dauphine
> OSBORN MALEDON, P.A.
> 2929 North Central Avenue, 21st Floor
> Phoenix, AZ  85012-2793
>
> Myron D. Rumeld (*Pro Hac Vice*)
> Amy Covert (*Pro Hac Vice*)
> Russell L. Hirschhorn (*Pro Hac Vice*)
> PROSKAUER ROSE LLP
> Eleven Times Square
> New York, NY  10036-8299

---

[14]   As the Court recognized, the remainder of Frazier's claims under Count Three amount to Counts One, Two and Five repackaged as a fiduciary duty violation[.]" (Doc. 165, at 8.)  Accordingly, such claims necessarily fail if Counts One, Two and Five are dismissed.

Howard Shapiro (*Pro Hac Vice*)
Robert Rachal (*Pro Hac Vice*)
PROSKAUER ROSE LLP
Poydras Center
650 Poydras Street, Suite 1800
New Orleans, LA  70130-6146

**Attorneys for Defendants**


By:  s/ Dawn L. Dauphine

### **CERTIFICATE OF SERVICE**

I hereby certify that on August 9, 2013, the attached document was electronically transmitted to the Clerk of the Court using the CM/ECF System which will send notification of such filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

Upon receipt of the Notice of Electronic Filing, a copy of the attached document and Notice of Electronic Filing will be mailed to The Honorable Susan R. Bolton.


 s/ Jessica A. Lopez