**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Thomas G. Frazier, | No. CV-10-01618-PHX-SRB |
| Plaintiff, | **ORDER** |
| v. | |
| Honeywell Pension and Savings Plan, et al., | |
| Defendants. | |

The Court now considers Defendants' Motion for Summary Judgment ("Defs.' MSJ") (Doc. 213); Plaintiff's Motion for Partial Summary Judgment on Liability on All Counts of the Second Amended Complaint ("Pl.'s MSJ") (Doc. 232); Defendants' Motion to Strike ("Defs.' MTS") (Doc. 238); Plaintiff's Motion to Strike ("Pl.'s MTS") (Doc. 241); Plaintiff's Motion to Strike the Declaration of the Plan Administrator ("Pl.'s MTS PA Decl.") (Doc. 242); Plaintiff's Motion to Strike Exhibit 60 ("Pl.'s MTS Ex. 60") (Doc. 244); Defendants' Notice of Plaintiff's Violation of LRCiv 7.2(m)(2) ("Defs.' Notice") (Doc. 249); and Plaintiff's Motion to Strike New Arguments and Exhibits Offered for the First Time on Reply and to Strike Defendants' Legal Arguments Asserted in Defendants' Counter-Statement to Plaintiff's Additional Statement of Facts (Doc. 250). The Court heard oral argument concerning the Motions for Summary Judgment on November 18, 2013. (Doc. 254, Minute Entry.)

**I.    PRELIMINARY MATTERS**

The Court finds it necessary to address the various motions to strike before

1    proceeding to the summary judgment motions to clarify what exactly the Court has and

2    has not considered in addressing the parties' arguments for and against summary

3    judgment. Local Rule 7.2(m)(1) allows parties to file motions to strike only when

4    authorized by statute or rule or on the ground that a filing is prohibited by statute, rule, or

5    court order. However, Local Rule 7.2(m)(2) specifically instructs parties that wish to

6    object to certain evidence filed in support of a motion for summary judgment to include

7    such objections in that party's responsive statement of facts or, if making an objection to

8    evidence in a responsive statement of facts, in a reply memorandum to the underlying

9    motion. Objections contained within a responsive statement of facts "must be stated

10    summarily without argument." *See* LRCiv. 7.2(m)(2). Both parties have violated these

11    rules. (*See, e.g.*, Doc. 238, Defs.' Objections & Resps. To Pl.'s Corrected Separate

12    Statement of Facts ("DRSOF") (including substantial argument in objecting to Plaintiff's

13    statement of facts); Pl.'s MTS at 73-75 (moving with substantial argument to strike

14    certain portions of Defendants' statement of facts in support of Defs.' MSJ and

15    supporting evidence).) The Court therefore denies all the motions to strike currently

16    before it as procedurally improper. (Docs. 238, 241, 242, 244, 250) Furthermore, as

17    Defendants' noted in their Notice, Plaintiff has filed a reply statement of facts in support

18    of his Motion for Summary Judgment in a document titled "Plaintiff's Opposition to

19    Defendants' Motion to Strike Certain Statements Contained in Plaintiff's Statement of

20    Facts in Support of Motion for Summary Judgment and Plaintiff's Objections to

21    Defendants' Response to Plaintiff's Statement of Facts and Additional Facts Asserted by

22    Defendants and Motion to Strike Exhibit 60" (Doc. 244), which the Local Rules do not

23    permit. *See* LRCiv. 56. Because the Court sees nothing in Doc. 244 that is allowed under

24    the Local Rules, the Court strikes the document from the record and will not consider its

25    contents. For the same reason, the Court strikes document 245 titled "Defendants'

26    Counter-Statement to Plaintiff's Additional Statement of Facts."

27    **II.**      **BACKGROUND**

28         In 1983, the Allied Corporation acquired the Bendix Corporation ("Bendix"), with

1    which it merged in 1985. (DSOF ¶ 11; PRSOF ¶ 11.) The combined company then

2    merged with "the Signal Companies" and became AlliedSignal. (PSOF ¶ 83; DRSOF ¶

3    83.) Bendix Avionics was merged with King Radio Corporation in 1985. (PSOF ¶ 129;

4    DRSOF ¶ 129.)

5         Plaintiff was originally hired by Sundstrand Corporation ("Sundstrand") in 1988 in

6    Irvine, California. (DSOF ¶ 40; PRSOF ¶ 40.) Plaintiff transferred to Sundstrand's

7    facility in Prescott, Arizona in 1991 after the Irvine facility was closed. (DSOF ¶ 40;

8    PRSOF ¶ 40; PSOF ¶ 93; DRSOF ¶ 93.) AlliedSignal acquired Sundstrand's Data

9    Control division in 1993, including the Prescott, Arizona facility. (DSOF ¶ 3; PRSOF ¶ 3;

10   PSOF ¶ 97; DRSOF ¶ 97.) AlliedSignal announced in November 1995 that it would close

11   the Prescott facility and offered many employees the option of transferring to other

12   AlliedSignal locations. (DSOF ¶ 42; PRSOF ¶ 42.) Plaintiff chose to transfer to a King

13   Radio Corporation facility in Olathe, Kansas, though he also had the option of

14   transferring to a facility in Redmond, Washington. (*See* DSOF ¶ 44; PRSOF ¶ 44; PSOF

15   ¶¶ 136-37; DRSOF ¶¶ 136-37.) Plaintiff worked at the Olathe facility from April 1, 1996

16   until March 2000 when he transferred to a facility in Deer Valley, Arizona that

17   AlliedSignal acquired through its acquisition of Honeywell Incorporated in December

18   1999. (DSOF ¶ 48; PRSOF ¶ 48; PSOF ¶ 140; DRSOF ¶ 140.)[1] Plaintiff retired in 2008.

19   (DSOF ¶ 54; PRSOF ¶ 54.)

20        The parties agree that after AlliedSignal acquired Sundstrand, Plaintiff became a

21   participant in the Bendix pension plan. (*See* Defs.' MSJ at 12; Pl.'s MSJ at 1.) The parties

22   dispute, among other things, which Bendix plan was in effect at the time Plaintiff became

23   a participant and whether Plaintiff remained a participant in that plan until his retirement

24   in 2008 or whether he ceased to be a participant in that plan when he transferred to the

25   Olathe facility in 1996. (*See* Defs.' MSJ at 12-14; Pl.'s MSJ at 1-4.) Plaintiff asserts, and

26   Defendants do not dispute, that his pension benefits would be calculated differently

27

28        [1] AlliedSignal changed its name to Honeywell International Inc. on December 2,
     1999 after purchasing Honeywell Inc. (PSOF ¶ 49; DRSOF ¶ 49.)

1     depending on the answer to those questions. (Pl.'s MSJ at 4.)

2         Plaintiff submitted a claim for pension benefits on July 8, 2008 and submitted
3     additional information on August 20, 2008. (PSOF ¶ 245; DRSOF ¶ 245.) Plaintiff
4     sought information about his claim on multiple occasions during the following months.
5     (PSOF ¶¶ 248-50; DRSOF ¶¶ 248-50.) Defendants sent Plaintiff a letter denying his
6     claim on July 31, 2009. (DSOF ¶ 75; PRSOF ¶ 75.) After requesting certain documents
7     that Defendants had referenced in their claim denial, Plaintiff filed an appeal on
8     September 28, 2009. (PSOF ¶¶ 252-55; DRSOF ¶¶ 252-55.) Plaintiff "re-urged" his
9     appeal on March 17, 2010 because Defendants had not responded. (PSOF ¶ 257; DRSOF
10    ¶ 257.) Plaintiff filed the present case on July 30, 2010, at which time Defendants still
11    had not responded to his administrative appeal. (*See* Doc. 1, Compl.; PSOF ¶ 264;
12    DRSOF ¶ 264.) On May 6, 2011, the Pension and Savings Plan Appeals Committee sent
13    Plaintiff a letter denying his appeal. (DSOF ¶ 77; PRSOF ¶ 77.)

14        One week later, Defendants filed a Motion to Dismiss Plaintiff's Complaint on
15    May 12, 2011. (Doc. 40.) The Court denied the Motion on December 6, 2011. (Doc. 71,
16    Dec. 6, 2011 Order.) The Court granted Plaintiff leave to file a Second Amended
17    Complaint on October 3, 2012 and Plaintiff filed a Second Amended Class Action
18    Complaint on October 9, 2012. (*See* Doc. 137, Oct. 3, 2012 Order; Doc. 141, Second Am.
19    Class Action Compl. ("SAC").) Plaintiff brings five causes of action for various
20    violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§
21    1001-1461: (1) failure to pay benefits according to plan terms under 29 U.S.C. §
22    1132(a)(1)(B); (2) improperly reducing accrued benefits under 29 U.S.C. § 1054(g)-(h);
23    (3) breach of fiduciary duties under 29 U.S.C. § 1104(a)(1), for failure to comply with
24    plan terms, failure to disclose plan changes, and misrepresentation of rights, (4) failure to
25    comply with plan procedures for deciding claims for benefits under 29 U.S.C. § 1133,
26    and (5) failure to distribute SPDs in violation of 29 U.S.C. §§ 1021, 1022, 1024. (SAC ¶¶
27    98-130.) The Court certified all of Plaintiff's claims as class actions except for Count
28    Four and his claim for fiduciary misrepresentation under Count Three. (*See* Doc. 165,

1    Nov. 20, 2012 Order.) Each party now moves for summary judgment.

2    **III.    LEGAL STANDARDS AND ANALYSIS**

3          **A.     Summary Judgment Standard**

4          Under Federal Rule of Civil Procedure 56, summary judgment is properly granted

5    when: (1) there is no genuine dispute as to any material fact; and (2) after viewing the

6    evidence most favorably to the non-moving party, the movant is clearly entitled to prevail

7    as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23

8    (1986); *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1288-89 (9th Cir. 1987). A fact is

9    "material" when, under the governing substantive law, it could affect the outcome of the

10   case. *Anderson*, 477 U.S. at 248 (1986). A genuine dispute of material fact arises if "the

11   evidence is such that a reasonable jury could return a verdict for the nonmoving party."

12   *Id.*

13         In considering a motion for summary judgment, the court must regard as true the

14   non-moving party's evidence if it is supported by affidavits or other evidentiary material,

15   and "all inferences are to be drawn in the light most favorable to the non-moving party."

16   *Eisenberg*, 815 F.2d at 1289; *see also Celotex*, 477 U.S. at 324. However, the non-

17   moving party may not merely rest on its pleadings; it must produce some significant

18   probative evidence tending to contradict the moving party's allegations, thereby creating

19   a material question of fact. *Anderson*, 477 U.S. at 256-57 (holding that the plaintiff must

20   present affirmative evidence to defeat a properly supported motion for summary

21   judgment); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968).

22         **B.     Analysis**

23               **1.     Deference to the Plan Administrator**

24         The parties disagree as to whether the Court should give substantial deference to

25   the Plan Administrator's interpretation of the various pension plans. (*See* Defs.' MSJ at

26   16-18; Pl.'s MSJ at 5-6.) Defendants argue, and Plaintiff does not dispute, that the plans

27   conferred discretion to the plan administrator. (*See* Defs.' MSJ at 16; Pl.'s MSJ at 5-6.)

28   However, Plaintiff argues that the plan administrator's determinations are not deserving

1  of deference because the administrator did not follow plan or statutory procedure for

2  deciding benefit claims. (Pl.'s MSJ at 5-6.)

3  
> When a plan does not confer discretion on the administrator "to determine
> eligibility for benefits or to construe the terms of the plan," a court must
4  review [a] denial of benefits de novo. . . . But if the plan *does* confer
> discretionary authority as a matter of contractual agreement, then the
5  standard of review shifts to abuse of discretion.

6  *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (en banc).

7  However, "[w]hen an administrator engages in wholesale and flagrant violations of the

8  procedural requirements of ERISA, and thus acts in utter disregard of the underlying

9  purpose of the plan as well," de novo review applies regardless of the administrator's

10  discretion. *Id.* at 971.

11  ERISA requires plan administrators to

12  
> (1) provide adequate notice in writing to any participant or beneficiary
13  whose claim for benefits under the plan has been denied, setting forth the
> specific reasons for such denial, written in a manner calculated to be
14  understood by the participant, and

15  
> (2) afford a reasonable opportunity to any participant whose claim for
16  benefits has been denied for a full and fair review by the appropriate named
> fiduciary of the decision denying the claim.

17  29 U.S.C. § 1133.

18  Plaintiff filed his initial claim for benefits on July 8, 2008, but did not receive a

19  denial until July 31, 2009—more than one year later—despite making several inquiries.

20  (*See* PSOF ¶¶ 245, 248-50; DRSOF ¶¶ 245, 248-50; DSOF ¶ 75; PRSOF ¶ 75.) Plaintiff

21  filed an appeal on September 28, 2009, "re-urged" his appeal on March 17, 2010, and did

22  not hear a response until May 6, 2011—nearly two years after filing the appeal and only

23  after filing a lawsuit. (*See* PSOF ¶¶ 252-55, 257; DRSOF ¶¶ 252-55, 257; DSOF ¶ 77;

24  PRSOF ¶ 77.) Because the decision on appeal was not sent until long after Plaintiff had

25  filed this lawsuit and just one week before Defendants' filed a Motion to Dismiss (relying

26  on the administrator's appellate decision), it is clear that the decision was issued with the

27  present litigation in mind and may never have been issued were it not for the lawsuit.

28  (*See* Doc. 40.) Such a long delay is not allowed under the plan terms or federal

1      regulations. 29 C.F.R. § 2560.503-1(f)(1) (setting a ninety-day maximum deadline for an

2      initial claim determination with the possibility of no more than a ninety-day extension),

3      (i)(1)(i) (setting a sixty-day maximum deadline for ruling on an appeal with the

4      possibility of no more than a sixty-day extension); (DSOF, Ex. 10 (copy of the 1987

5      Bendix Plan) (setting no deadlines and therefore requiring the default deadlines from the

6      regulations), Ex. 11 (copy of the 1994 General Aviation Avionics (King Radio) Plan)

7      (following the regulations' sixty- and ninety-day deadlines), Ex. 16 (copy of the 1994

8      AlliedSignal Plan) (following the regulations' sixty- and ninety-day deadlines); Ex. 24

9      (copy of the 1996 AlliedSignal Plan) (following the regulations' sixty- and ninety-day

10     deadlines); Ex. 1 (copy of the 2000 Honeywell Retirement Earnings Plan) (setting a 120-

11     day maximum for determining all claims, whether initially or on appeal).) The Court

12     finds that the Plan Administrator's violation of these deadlines was so flagrant that it

13     cannot be said to have exercised its discretion. *See Abatie*, 458 F.3d at 973 ("[I]f the plan

14     administrator's procedural defalcations are flagrant, de novo review applies."); *Jebian v.*

15     *Hewlett-Packard Co. Emp. Benefits Org. Income Protection Plan*, 349 F.3d 1098, 1103

16     (9th Cir. 2003) ("[W]here, according to plan and regulatory language, a claim is [deemed

17     denied] on review after the expiration of a given time period, there is no opportunity for

18     the exercise of discretion and the denial is usually to be reviewed *de novo*. While

19     deference may be due to a plan administrator that is engaged in a good faith attempt to

20     comply with its deadlines when they lapse, this is not such a case.") Consequently, the

21     Court will review the Plan Administrator's decision de novo.[2] Based on this finding, the

22     Court must necessarily (and does) find in favor of Plaintiff on Count Four.

23          **2.     Count One**

24          To resolve Count One the Court must construe the terms of the relevant plan

25     documents, which will also address Plaintiff's request for declaratory relief. Under

26     Plaintiff's reading of the plan documents, he was entitled to accrue benefits under the

27

28          [2] Because the Court's review is de novo, it can consider evidence outside of the
       administrative record. *Abatie*, 458 F.3d at 973.

1  Bendix Plan during his entire employment from 1993 through 2008, despite his transfers

2  to different locations. (*See* Pl.'s MSJ at 3-4.)[3] Defendants argue that Plaintiff has

3  misinterpreted the various plans and that he was never entitled to continue to accrue

4  benefits under the Bendix Plan after transferring to Olathe and eventually Deer Valley.

5  (*See* Defs.' MSJ at 12-13.)[4]

6  When interpreting ERISA plan terms, courts consider state law contract principles

7  in light of the policies of ERISA and other federal labor laws. *Richardson v. Pension*

8  *Plan of Bethlehem Steel Corp.*, 112 F.3d 982, 985 (9th Cir. 1997). That being said, courts

9  interpret ERISA plan terms "in an ordinary and popular sense as would a person of

10  average intelligence and experience." *Evans v. Safeco Life Ins. Co.*, 916 F.2d 1437, 1441

11  (9th Cir. 1990) (alteration incorporated). To make that determination, courts look first to

12  the plan's express terms to determine the parties' intent. *McDaniel v. Chevron Corp.*, 203

13  F.3d 1099, 1110 (9th Cir. 2000). "Each provision in an agreement should be construed

14  consistently with the entire document such that no provision is rendered nugatory."

15  *Richardson*, 112 F.3d at 985. Only when a plan term is ambiguous will courts look to

16  extrinsic evidence. *Id.* If the terms are still ambiguous, then courts will adopt the

17  interpretation most favorable to the beneficiary. *Blankenship v. Liberty Life Assurance*

18  *Co. of Boston*, 486 F.3d 620, 625 (9th Cir. 2007).

19  ### a.    Olathe, Kansas Facility

20  The parties' dispute centers on whether the Olathe and Deer Valley facilities are

21  ─────────────────

22  [3] The Bendix Plan was a "final average pay" pension plan. (DSOF ¶ 12; PRSOF ¶ 12.) Plaintiff's benefits were ultimately calculated under the King Radio "cash-balance" plan for most of his years of work, which resulted in a less generous pension than he would have received under the Bendix Plan. (*See* Pl.'s MSJ at 3.)

23

24

25  [4] Defendants refer to the plan that was amended in 1994 and made retroactive to 1993 as the "1993 Plan." (*See, e.g.*, Defs.' MSJ at 2.) Plaintiff refers to that same plan as the "1994 Plan." (*See, e.g.*, Pl.'s MSJ at 8.) The parties have the same dispute concerning the 1996 amendment that was made retroactive to 1995. (*See, e.g.*, Pl.'s MSJ at 8; Defs.' MSJ at 8.) The plan names are irrelevant. In the interest of clarity, the Court will refer to the plans as the "1994 Plan" and "1996 Plan" respectively throughout this Order because the parties dispute whether the amendments applied retroactively, but do not dispute that the amendments were actually written in 1994 and 1996. (*See* PSOF ¶¶ 20, 32; DRSOF ¶¶ 20, 32.)

26

27

28

1    part of the "company" as defined in the various plans. (*See* Defs.' MSJ at 7-10; Pl.'s MSJ

2    at 7-8.) Plaintiff argues that they were part of the "company" and therefore he was

3    entitled to continue accruing benefits under the Bendix Plan after his transfers. (Pl.'s MSJ

4    at 7-8.)[5] The 1987 Plan defines "Company" as follows:

> "Company" means such division of such divisions of the Corporation and such other businesses (or specified divisions thereof) whether or not incorporated which have been or shall be acquired by the Corporation of which the Corporation owns at least 80% of the stock or ownership interest, as may be designated from time to time by the Board of Directors, but as to each such other business, only with respect to such period prior to acquisition as may be determined by the Board of Directors and only with respect to any period subsequent to acquisition during which at least 80% of the stock or other ownership interest of such business is owned by the Corporation. Schedule A to the Plan, as amended from time to time, lists the business units covered by the Plan. "Affiliated Company" means any other business, whether or not incorporated, of which the Corporation owns, directly or indirectly, at least twenty five percent (25%) of the voting stock or other ownership interest, and any member of the same Controlled Group as the Company, for so long as the Corporation owns a twenty five percent interest in such business, or is part of the same Controlled Group. "Expatriate Subsidiary" shall mean an Affiliated Company which is designated from time to time by the Board of Directors. The term "Company" shall include Expatriate Subsidiaries, but only with respect to and to the extent they employ Expatriates.

16    (1987 Plan at 2.)[6] Schedule A lists the following "participating companies":

Former Bendix Divisions of:
Bendix Corporate Headquarters
Allied-Bendix Aerospace
Allied Automotive

---

[5] Although the Court does not find that the 1987 version of the Bendix Plan is controlling for purposes of deciding Plaintiff's claim, it nonetheless analyzes the 1987 Plan terms to highlight consistencies between it and later plans.

[6] "'Corporation' means the Allied Corporation." (*Id.* at 3.)

> 'Controlled Group' means Allied Corporation and any other company which is related to the Corporation as a member of a controlled group of corporations in accordance with Section 414(b) of the Internal Revenue Code or as a trade or business under common control in accordance with Section 414(c) of the Internal Revenue Code. Each such other company shall be included in the Group only for the period to or during which such other company is a member of a controlled group or under common control. A 'Controlled Group Company' is a company in the Controlled Group.

(*Id.*)

Allied Electrical Connectors

Bendix Field Engineering Corporation
Bendix Transportation Management Corporation
Bendix International Consulting Corporation
Bendix International Finance Corporation
Bendix International Service Corporation

(*Id.* at 47.)

Defendants rely on the interpretation of the 1987 Plan provided by Honeywell International Inc.'s Vice President of Compensation and Benefits, Brian Marcotte, to support their argument that the Olathe and Deer Valley facilities were not part of the "company." (*See* Defs.' MSJ at 11-12; *see also* Doc. 215-1, Decl. of Brian Marcotte in Supp. of Defs.' MSJ ("Marcotte Decl.").) Mr. Marcotte argues that "[t]he definition of ***Company*** provides that only those divisions and businesses that are designated by the Board of Directors and that appear on Schedule A of the Bendix Plan are permitted to participate in the Bendix Plan." (Marcotte Decl. ¶ 16.) This interpretation cannot be correct. While the definition of "Company" includes a reference to board designation for companies that Allied Corporation owned at least an eighty percent stake in, there is no requirement for board designation for "affiliated companies." (*See* 1987 Plan at 2.) Thus, the "company" is not limited to those entities designated by a board as forming a part of it. Furthermore, because board designation is unnecessary for "affiliated companies" in which Allied Corporation had only a twenty-five-percent stake, even the entities in which Allied Corporation had an eighty-percent stake (and might require board designation), would qualify as part of the Corporation as "affiliated companies" even without board designation. But that interpretation would be improper because it would nullify words in the contract, i.e., the phrase regarding board designation. *See Gfeller v. Scottsdale Vista N. Townhomes Ass'n*, 969 P.2d 658, 660 (Ariz. Ct. App. 1998) ("We will, if possible, interpret a contract in such a way as to reconcile and give meaning to all of its terms, if reconciliation can be accomplished by any reasonable interpretation."). It would also be improper to interpret Schedule A as an exclusive list of the entities to which the Plan applied because doing so would render the definition of "Company" (which states much

- 10 -

1    more than simply "the entities listed in Schedule A") superfluous. *See Taylor v. State*

2    *Farm Mut. Auto. Ins. Co.*, 854 P.2d 1134, 1144 n.9 (Ariz. 1993) ("[A] contract should be

3    interpreted, if at all possible, in a way that does not render parts of it superfluous."). The

4    Plan's terms are therefore ambiguous.

5          The Court must look to the Summary Plan Description ("SPD") to determine the

6    meaning of the 1987 Plan before looking to extrinsic evidence. *See Bergt v. Ret. Plan for*

7    *Pilots Employed by MarkAir, Inc.*, 293 F.3d 1139, 1144-45 (9th Cir. 2002). ERISA

8    requires employers to provide a "summary plan description of any employee benefit plan

9    . . . to participants and beneficiaries." 29 U.S.C. § 1022(a). The SPD must contain a

10    plain-language summary of all material plan terms, including "the plan's requirements

11    respecting eligibility for participation and benefits." *See* 29 U.S.C. § 1022(a)-(b).

12    "[S]ummary documents, important as they are, provide communication with beneficiaries

13    *about* the plan, but . . . their statements do not themselves constitute the *terms* of the plan

14    . . . ." *CIGNA Corp. v. Amara*, 131 S. Ct. 1866, 1878 (2011). If there is a conflict between

15    the master plan document and the SPD, the provision that is more favorable to the

16    employee controls. *See Bergt*, 293 F.3d at 1145.

17          The 1987 Plan was summarized in an October 1986 SPD. (DSOF ¶ 61, Ex. 39

18    (copy of the 1986 SPD); PRSOF ¶ 61.) According to that SPD, the Bendix Plan applied

19    to all permanent salaried employees "of the following Bendix Aerospace Sector divisions

20    and subsidiaries: . . . Bendix Avionics Division," among others. (*See* 1986 SPD at 1, 47.)[7]

21    In other words, although the SPD does not clarify all of the ambiguities in the 1987

22    Plan's definition of "company," it does unambiguously state that the Plan applied to the

23    Bendix Avionics Division. Additionally, its language states unambiguously that the Plan

24    applies to "the following . . . *divisions*"—not to the following *locations*, so its reference

25    to Fort Lauderdale, Florida should not be read as a limitation. (*See id.* (emphasis added).)

26

27          [7] The use of the phrase "division or subsidiaries" negates Defendants' argument

28    (whether properly raised or not) that the Bendix Plan did not apply at the Olathe facility because King Radio was a subsidiary of Bendix instead of a division. (*See* Doc. 243, Reply Br. in Supp. of Defs.' MSJ ("Defs.' Reply") at 5-6.)

1   This fact is important because the parties agree that Bendix Avionics was merged with

2   King Radio Corporation in 1985. (*See* PSOF ¶ 129; DRSOF ¶ 129.) Thus, the SPD

3   suggests that the Plan applied to employees of the Olathe, Kansas facility as employees

4   of the Bendix Avionics Division.

5          This reading is confirmed by multiple facts. First, the SPD for the King Radio

6   Pension Plan states that "[a]ll salaried employees of AlliedSignal General Aviation

7   Avionics are members of the [King Radio Plan] *unless they are eligible for benefits under*

8   *the Bendix Pension Plan.*" (PSOF, Ex. 12 (copy of King Radio SPD) at 3.) Thus, it is

9   clear that AlliedSignal (which owned King Radio by the time this SPD was written and

10  was therefore responsible for its contents) believed that it was possible to participate in

11  the Bendix Plan while working at a King Radio facility. Second, many employees that

12  transferred from the Fort Lauderdale location to the Olathe facility continued to accrue

13  benefits under the Bendix Plan. (PSOF ¶¶ 158-60; DRSOF ¶¶ 158-60.)[8] Third, a human

14  resources manager at the Olathe facility wrote a memorandum to Allied-Bendix

15  Aerospace Headquarters stating, in relevant part:

16          As you know, the salaried employees of General Aviation Avionics
        participate in a cash balance pension plan. Actuarially, it is less rich than
17      either the Bendix or Garrett traditional retirement plans.

18          Therefore, it has been our policy that transferees from other AlliedSignal
        units into GAA participate in the Bendix Retirement Plan rather than our
19      own cash balance plan, under the following conditions:

20              1.     The transferee was participating in either the Bendix or
            Garrett Retirement Plans at the time of transfer to our business unit;
21
                2.     The employee transferred to our business unit with no break
22          in service; and

23              3.     The transfer occurred after January 31, 1985, the date King
            Radio Corporation was acquired by AlliedSignal.
24

25  (PSOF ¶ 163, Ex. 58 (copy of the memorandum).) These facts support reading the 1987

26  Plan to apply to the Olathe facility because AlliedSignal interpreted the Plan to apply at

27  _____

28       [8] It appears that employees transferring from other locations also continued to
    accrue benefits under the Bendix Plan after transferring to the Olathe facility. (*See* PSOF
    ¶¶ 198-99; DRSOF ¶¶ 198-99.)

1   the Olathe facility. Based on this evidence, the Court finds that the Olathe, Kansas

2   facility was a Bendix Plan location under the 1987 Plan.

3   However, when Plaintiff transferred to Olathe in April 1996, the 1994 version of

4   the Plan was in force and Plaintiff could not have accrued any benefits in Olathe until he

5   actually transferred there, so the anti-cutback rule does not come into play concerning the

6   1987 Plan.[9] Consequently, the Court must determine whether the Olathe facility

7   continued to be a participating location under the 1994 Plan to determine whether

8   Plaintiff was entitled to continue accruing benefits under the Bendix Plan after he

9   transferred.

10   The 1994 Plan states that it is "generally applicable only to Employees who are

11   employed by an Employer on or after January 1, 1993." (DSOF, Ex. 16 1994 Salaried

12   Employees Pension Plan of AlliedSignal Inc. ("1994 Plan") at 1.) "Employer" is defined

13   as

14   
15   an Affiliate, or division thereof, which is participating in this Plan for the benefits of its Eligible Employees. Participating Employers as of January 1, 1993 are identified in the Appendix. An affiliate may become an Employer by adopting the Plan for the benefit of its Employees in the manner described in Article XIII.

16   

17   (*Id.* at 7.) The appendix lists AlliedSignal Inc., AlliedSignal Technical Services Inc., and

18   Bendix Transportation Management Corporation as participating employers as of January

19   1, 1993. (*Id.* at App'x.) The Plan defines "Affiliate" with reference to the internal revenue

20   code:

21   

22   2.1 "Affiliate" means--

23   (a) any corporation while it is a member of the same "controlled group" of corporations (within the meaning of [26 U.S.C. §] 414(b)) as the Company [(defined as AlliedSignal Inc.)];

24   

25   (b) any other trade or business (whether or not incorporated) while it is under "common control" (within the meaning of Code section 414(c)) with the Company;

26   

27   ───────────────

28   [9] The 1994 Plan was still in effect because Defendants did not amend the Plan until September 10, 1996, regardless of when that amendment supposedly applied. (*See* PSOF ¶ 32; DRSOF ¶ 32.)

- 13 -

1

2

(c) any organization during any period in which it (along with the Company) is a member of an "affiliated service group" (within the meaning of Code section 414(m); or

3

4

(d) any entity during any period in which it is required to be aggregated with the Company under Code section 414(o).

5

6

(*Id.* at 2.) Importantly, 26 U.S.C. § 414(b) defines "controlled group" by reference to 26 U.S.C. § 1563(a), which states that

7

8

the term "controlled group of corporations" means any group of--

9

10

(1) Parent-Subsidiary controlled group.--One or more chains of corporations connected through stock ownership with a common parent corporation if--

11

12

(A) stock possessing at least 80 percent of the total combined voting power of all classes of stock of each of the corporations, except the common parent corporation, is owned . . . by one or more of the other corporations; and

13

14

15

16

17

(B) the common parent corporation owns . . . stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of stock of at least one of the other corporations, excluding, in computing such voting power or value, stock owned directly by such other corporations.

18

26 U.S.C. § 1563(a).

19

20

21

22

23

24

25

Following this complex chain of definitions, the Court finds that the 1994 Bendix Plan applied to the Olathe facility. Starting from the end, King Radio Corporation was wholly owned by AlliedSignal, which satisfies the definition of "controlled group" found in the internal revenue code. (*See* DSOF ¶ 4 ("King Radio Corporation ('King Radio') was a wholly owned subsidiary of Allied.").)[10] Because King Radio was part of a "controlled group" it satisfied the definition of "affiliate" in the 1994 Plan. (*See* 1994

26

27

28

[10] Plaintiff disputes this fact and argues that King Radio was a wholly owned subsidiary of Bendix. (PRSOF ¶ 4.) The difference is irrelevant because Bendix was also wholly owned by AlliedSignal, which would make King Radio a wholly owned subsidiary of Allied even under Plaintiff's version of the facts. (*See* DSOF ¶ 2.)

- 14 -

1    Plan at 2.)[11] As an "affiliate" of AlliedSignal Inc. (a specifically-listed participant), King

2    Radio was also an "employer" under the 1994 Plan. (*Id.* at 7.)[12] Because the 1994 Plan

3    was applicable to "Employees who are employed by an Employer," the Plan was

4    applicable to employees at the Olathe facility. (*See id.* at 1.) This reading is also

5    supported by the fact that many employees at the Olathe facility received benefits under

6    the Bendix Plan, as discussed above. Accordingly, the Court finds that the Olathe, Kansas

7    facility was a Bendix Plan location. Plaintiff was entitled to continue to accrue benefits

8    under the Bendix Plan after he transferred to the Olathe, Kansas facility.

9                               **b.    Deer Valley, Arizona Facility**

10           Whether Plaintiff continued to accrue benefits under the Bendix Plan following his

11    transfer to Deer Valley is an easier question. By the time Plaintiff transferred to the Deer

12    Valley location in March 2000, Defendants argue that AlliedSignal's pension plans had

13    been "amended to provide that all legacy AlliedSignal employees would remain in

14    AlliedSignal plans and all legacy Honeywell Inc. employees would remain in Honeywell

15    Inc. plans, even if the employees subsequently transferred between legacy AlliedSignal

16    and legacy Honeywell Inc. locations." (DSOF ¶ 9.) In other words, Defendants argue that

17    Plaintiff's transfer to Deer Valley did not affect his pension rights, which would mean

18    that Plaintiff continued to accrue benefits under the Bendix Plan. Plaintiff agrees that

19    Plaintiff should have stayed in the same plan he was already in after transferring to the

20    Deer Valley location. (*See* Pl.'s Resp. at 6-7.) Accordingly, there is no dispute and the

21    Court finds that Plaintiff was entitled to continue to accrue benefits under the Bendix

22    Plan for all of his years of employment at Deer Valley and beyond until his retirement in

23    2008. Because Defendants have not paid Plaintiff retirement benefits under the Bendix

24

25           [11] Again, because King Radio was a wholly-owned subsidiary and because the
      Plan applied to "Affiliate[s], or division[s] thereof," Defendants' argument that the
26    Bendix Plan did not apply at King Radio because it was a subsidiary of Bendix instead of
      a division fails. (*See* Defs.' Reply at 5-6.)
27

28           [12] Because AlliedSignal Inc. (and thereby all of its subsidiaries and their divisions)
      was specifically listed as a Plan participant, there was no need for King Radio to
      specifically adopt the Plan according to the Article XIII procedures.

1    Plan for the entire length of his employment, the Court grants summary judgment in

2    favor of Plaintiff on Count One.

3                    **3.    Count Three: Breach of Fiduciary Duty**

4    Plaintiff claims that Defendants breached their fiduciary duties (1) through "the

5    failure to calculate and pay benefits and otherwise administer the Bendix Plan in

6    accordance with the Bendix SPD, Bendix Plan terms and promises made to Plaintiff," (2)

7    "by failing to provide disclosures of changes to the Bendix Plan and summary plan

8    descriptions required under ERISA," (3) "by concealing such changes and amendments

9    and misrepresenting and/or misleading Plaintiff" about his pension rights and the

10   consequences of his transfers, (4) "by purporting to calculate and pay benefits based on

11   an election made in the year 2000 in which Defendants misrepresented the plans under

12   which Plaintiff and class members were participants and failed to give participants

13   appropriate information, choices and disclosures about the election and the effect of their

14   benefits," and (5) "by failing to take steps to remedy the breaches of fiduciary duty."

15   (SAC ¶ 117.)

16   ERISA requires plan fiduciaries to discharge their duties under the plan:

17
18   solely in the interest of the participants and beneficiaries and . . . with the
     care, skill, prudence, and diligence under the circumstances then prevailing
     that a prudent man acting in a like capacity and familiar with such matters
19   would use in the conduct of an enterprise of a like character and with like
     aims; . . . [and] in accordance with the documents and instruments
20   governing the plan insofar as such documents and instruments are
     consistent with the provisions of this subchapter and subchapter III of this
     chapter.
21

22   29 U.S.C. § 1104(a)(1). "[T]he ERISA fiduciary duty includes the common law duty of

23   loyalty, which requires fiduciaries to deal fairly and honestly with beneficiaries." *Farr v.*

24   *U.S. W. Commc'ns., Inc.*, 151 F.3d 908, 915 (9th Cir. 1998).

25   Because the Court has already determined that Plaintiff was entitled to benefits

26   under the Bendix Plan, Defendants necessarily breached their fiduciary duties to pay

27   benefits according to plan terms by not doing so. *See* 29 U.S.C. § 1104(a)(1).[13] The Court

28
     _____

     [13] Because the Court finds that Defendants breached their fiduciary duties in some

                              - 16 -

1    grants summary judgment in favor of Plaintiff on Count Three.

2                   **4.        Count Five: Failure to Furnish SPDs**

3          In response to Plaintiff's argument that Defendants failed to furnish SPDs,

4    Defendants argue that they distributed SPDs according to a company policy under which

5    "corporate headquarters would obtain the 'head count' of participants at each specific

6    business unit and either direct the printer to drop-ship the SPDs directly to the facilities

7    for distribution or, upon request by a facility, drop-ship the SPDs to the business unit's

8    headquarters for subsequent distribution to individual sites." (DSOF ¶ 63.) Regulation

9    requires SPDs to be "sent by a method or methods of delivery likely to result in full

10   distribution." 29 C.F.R. § 2520.104b-1(b)(1). Regulation further clarifies that "in no case

11   is it acceptable merely to place copies of the material in a location frequented by

12   participants." *Id.* Defendants have described a policy that does nothing more than "place

13   copies of the material in a location [(i.e., company locations generally)] frequented by

14   participants." *See id.*; (DSOF ¶ 63). Thus, even accepting Defendants' statement as true,

15   their policy did not comply with the law. Accordingly, Defendants have offered no

16   evidence that suggests that they distributed SPDs and the Court grants summary

17   judgment in favor of Plaintiff on Count Five.

18   **IV.    CONCLUSION**

19         The Court grants summary judgment in favor of Plaintiff on Counts One, Three,

20   Four, and Five. The undisputed evidence shows that Plaintiff was entitled to accrue

21   retirement benefits under the Bendix Plan for all of his years of employment from 1993

22   through his retirement in 2008. The undisputed evidence also shows that Defendants

23   failed to properly distribute SPDs and to follow Plan procedures and federal regulations

24   concerning how to adjudicate benefit claims. Because the question of whether certain

25   amendments reduced Plaintiff's accrued benefits did not arise in deciding these issues,

26   the Court does not address Plaintiff's Count Two at this time.

27

28
     ───────────────────────────────────────
     way, it need not address Plaintiff's alternative theories.

1    **IT IS ORDERED** denying Defendants' Motion for Summary Judgment (Doc.

2    213).

3    **IT IS FURTHER ORDERED** granting Plaintiff's Motion for Summary

4    Judgment on Liability on All Counts of the Second Amended Complaint (Doc. 232).

5    **IT IS FURTHER ORDERED** denying Plaintiff's Motion to Strike (Doc. 241).

6    **IT IS FURTHER ORDERED** denying Plaintiff's Motion to Strike Exhibit 60

7    (Doc. 244).

8    **IT IS FURTHER ORDERED** denying Plaintiff's Motion to Strike New

9    Arguments and Exhibits Offered for the First Time on Reply and to Strike Defendants'

10   Legal Arguments Asserted in Defendants' Counter-Statement to Plaintiff's Additional

11   Statement of Facts (Doc. 250).

12   **IT IS FURTHER ORDERED** striking docket entries 244 and 245 from the

13   record.

14

15   Dated this 27th day of November, 2013.

16

17

18   _____

19   Susan R. Bolton
     United States District Judge

20

21

22

23

24

25

26

27

28